and with me at council table is my colleague Kiersey Luther. I'm happy to take whatever suggestions the court has for argument because I know there are a lot of issues in this case, but where I'd like to begin is with the Speedy Trial Act issue. Can you adjust the microphone up so that we can hear you a little better? I'm sorry. Thank you. Is that better? Yes. I'd like to begin with the Speedy Trial Act issue. Judge Wright at the hearing on the Speedy Trial Act motion offered three reasons for denying the motion. All three of those reasons were demonstrably inaccurate and incorrect. The first reason he offered was that everybody was on board with that. That's on page 110 of the matter was that my client had objected to the continuance and that was clearly stated in the government's ex-party application. But even if your client objected, the Henry case would come into play, wouldn't it? No, Your Honor. One of the reasons why Henry allowed for the continuance to occur was that Henry's counsel had made statements in the request for a continuance saying that he needed additional time. But trial counsel for my client didn't say that at all. Well, the government says the court's order incorporated by reference the government's application so that all of the arguments in there were incorporated. What's your response to that? I have two responses and it happens in two layers. First, let's take a look at what Judge Wright actually said during the hearing. He said everybody was on board with that. And so Judge Wright was telling us he was under the impression that my client had actually stipulated to the continuance. But again, that was not true. But the application clearly stated that your client was objecting. Well, the application clearly stated that. That's correct. But then Judge Wright... And so the government says, well, incorporated that by reference. Well, what I'm saying is the evidence in the record, Judge Wright's own words about what happened directly refute that because he said, I thought every... He didn't even say, I thought everyone was on board with that. He was a little angry that the motion had been brought. He said everybody was on board with that. That tells me that Judge Wright did not realize that my client had objected to it. He missed it. He missed it. And then when did you bring that to his attention? In the motion to dismiss when we were supposed to. Not before that to say, well, Your Honor, everybody but my client agreed to this continuance. Well, if you read the record, what happened was as they were arguing, I mean, even before the argument began, Judge Wright introduced the argument by saying, I'm going to call the motion. And he said, you know, I'm a little bit... I can't remember what his exact words were, but he expressed some frustration and even a little annoyance about the fact that the motion had been filed at all. He said, I don't understand this. Everybody was on board with that. I don't see any language about everybody is on board with this. Can you tell me what exact language you're pointing to? 1ER110. Okay. And what is the language? He calls the motion, 207. This is defendant's motion to eliminate, a motion to dismiss under the Speedy Trial Act for various violations. You know, I took a look at the last ex parte application that contains a trial. It took us all the way up to November 15th. That's the continuance that he's talking about and that was objected to. And everybody was on board with that. So it's almost upsetting to have to deal with the motion to dismiss for violation of the Speedy Trial Act when there's been a stipulation after stipulation to continue. Judge Wright's clearly indicating that he thought my client was on board with the motion. So this is happening when he's hearing your client's motion to dismiss the indictment? That's correct. Okay. So, so what, so maybe he just forgot what happened months ago. Your Honor, he said, don't, first of all, I don't appreciate that tone. Mr. Brown. Your Honor, I'm sorry. I think, let me point out what I'm talking about. And I didn't mean any disrespect, Your Honor. What I'm pointing out is he said, I took a look at the last ex party application. He says, I reviewed the record. This is a motions hearing before a criminal trial. We have to assume that Judge Wright was prepared for this. Okay. And if he took a look at the application and he's still under the impression that my client had, had stipulated to the continuance, he was wrong. He was just wrong. Did he say, so I guess my question was, did he before him or is this just after the fact, Judge Wright, the district court? This, this was the only hearing on the motion. I'm sorry. This was the only hearing this, there was one hearing on the motion to dismiss, and this is the only thing that he said in these three pages. Well, at the time of the application. Right. So let's get to the time of the application. It was actually, it's worth noting. It wasn't a motion. It was an ex party application, which is an emergency procedure. Okay. It's also worth noting that Judge Wright has a standing order that says any opponent of an ex party application gets 24 hours to respond. But Ms. Nguyen didn't get 24 hours to respond because Judge Wright entered the order granting the ex party application 26 minutes after it was filed. Right. On the first page of the ex party application, it says Sandy Nguyen is the third defendant and she doesn't and she objects to this 26 minutes later that that order was entered. So we never got a chance to respond to it. The first time that we had a chance to respond was on the motion to dismiss. And that's the first time that Judge Wright mentioned the fact that he thought everybody was on board. So that's when it became apparent that he was mistaken about what happened. And I'm just wondering if there's any sort of a mechanism to bring that to the judge's attention at the 27th minute. Do you understand what I'm saying is why not as defense counsel call this to the judge's attention and say, you know, this my client objected to this. We were entitled to 24 hours to respond. You acted without giving me that opportunity. Why not do that? Well, I think the better question is to ask. And I'll answer that question. Okay. The mechanism for challenging a speedy trial act violation is a motion to dismiss. That's what my client did. And but I want to object to the premise of with respect, Your Honor, to the premise of the question. The Speedy Trial Act is I mean, it is as this court has said in Henry, with the Speedy Trial Act, there is a the duty to ensure that the defendant gets to trial within 70 days doesn't belong just to the defendant. It belongs also to the district court and to the government counsel. And I want the court. The reason I mentioned that this was an ex partee application is to highlight the fact that government counsel put this on an emergency schedule when government counsel didn't have to do that. They could have filed a motion and then later filed an ex partee application to shorten time. They could have done something to help respond. Government counsel could have filed something with the court to say, Miss, we never had a chance to respond to that. So I understand what the court is saying. But the burden to ensure that a defendant gets to trial within the 70 days under the Speedy Trial Act is shared by the defendant, the counsel for the government and the court. So under 316186, as I understand it, an objecting defendant is is carried along with the the other defendants unless the objecting defendant asks for a severance or unless it's not reasonable. So the government says, well, the reasonableness again was as to your client was contained in the government's application. What's wrong with that argument? There are three things wrong with that. First, the order itself never mentions subsection H-6. As the court just explained, the only way for my client to for the delay to count against my client is if the court makes findings under H-6. There are none. So the government says application incorporated by reference and that has all the H-6. Well, this is a strange, it doesn't. And it's a strange order that incorporates by reference all the arguments in the application, but then limits all the findings to H-7 findings. Those are the only findings that are in the order. And now H-7 is appropriate for the other two defendants who are requesting an ends of justice continuance. Those findings are relevant to that. What they are not relevant to is dragging my client along for 378 days. There are no findings with respect to H-6 in the order. It doesn't mention H-6 in the order. And that's why I think that Judge Wright didn't catch this. I think he didn't realize it and he thought it was just a stipulation among all of the defendants. Here's the other reason that that doesn't sort of save the day for the government or for the judge. This is a 378-day continuance over a year. Under Supreme Court authority and Ninth Circuit authority, 378 days is presumptively prejudicial. When you, when a judge receives an ex-party emergency application which signals to the judge that somebody wasn't agreeing to this in a stipulation and the continuance is for 378 days and one of the defendants is being dragged along with that against her will, the judge needs to take a careful look and the case law is very clear about this. The judge needs to make an independent inquiry to determine whether or not a continuance is needed at all and then also to determine whether the length of the continuance is warranted. Judge Wright didn't do that. And if you look, and this is the last part of the answer, if you look at the actual explanation for why the 378-day continuance was warranted, it just doesn't, it doesn't satisfy the requirements under the law. Can I ask you to pivot to the allocution issue? And you're arguing that your client was, was, I don't want to misstate it. Your argument is, is that Judge Wright exercised some sort of a bias against your client because she didn't wish to allocute? I think, yeah, I would say it was something like an allocution tax that was exercised against the client. Judge Kaczynski a long time ago recognized that defendants who want to seek an appeal but also want to come before the court and get a fair hearing at a sentencing face a very difficult situation. Judges expect, and judges, I'm sure, as you know, having done many sentencings, judges want to hear that a defendant is repentant, that's a factor that's relevant to deterrence, and they want to know that the defendant accepts responsibility. So, and you're right, Mr. Brown, because when I read that, your arguments, and I looked at the transcript, what I took away from that is that Judge Wright wanted to know more about your client and looking at her through the lens of the Section 3553A factors. So, for example, she has two children, I think, is that right? That's correct. You know, maybe she, he wants to hear how important she is to the upbringing of those children and how she's sharing parenting responsibilities with her husband, and she didn't do any of that. She didn't cooperate with the pre-sentence investigation report, Wrighter. That's, you could correct me in a moment. As far as I can tell, she wasn't cooperating with the PSR process, and then she didn't want to tell Judge Wright something short of accepting responsibility, which I agree with you. She doesn't have to stand up there and accept responsibility for something she maintains she didn't do, and she wants to preserve her appeal rights, but when the sentencing judge is trying to determine what should I do with this person, I feel like Judge Wright wanted to know more about her. So, why don't you address that to me? Like, why not just tell her, go tell the judge serving 180 months in a federal prison is going to be devastating to your family? Well, I think she did, and I think she made those arguments. If you read the entire sentencing transcript, you'll see that those arguments were made. Also, take a look at the PSR, because it has all the information that you just described about her family, her upbringing, her past, about the two children that she has, about the fact that her husband is going to have to take care of them while she's in prison. All of those things were in the PSR. But there's nothing wrong with a district judge saying, you know, I think his comments were along the lines of, well, I don't want to hear from her. She has a right to say, well, no, I'm not going to say anything on the advice of counsel. Correct me if I'm wrong, you weren't the counsel. I was not. I'm representing her at that time. So, whatever the advice was, whatever evaluation she made as to the risks and benefits, the argument here on appeal is that somehow she was penalized for it. I share Judge Liberty's views. There's nothing wrong with a district judge saying it will be helpful if I hear from the defendant. And it's her right to say no to that. But in terms of, like, whether she was penalized for the sentence, correct me if I'm wrong, I recall the sentence started with the district judge giving an indicated sentence. That's the same sentence that she eventually got, right? Right. So, I don't know how you can draw an inference of some sort of penalty imposed for the failure to allocate. All right. So, I'm going to start from the end and then get back to the beginning. The inference is drawn from the fact that, if you recall, Judge Wright started out suggesting he was going to give a 180-month sentence, but it was also pretty clear from the record that he was using the wrong PSR. He had not looked at the revised PSR or the revised recommendation from probation. So, I think that he was locked into an earlier set of facts that wasn't the, you know, what the prevailing set of facts were during the time of sentencing. And then the second thing is, you've got to read the transcript carefully and read also the government's cue off of what Judge Wright was saying. Judge Wright wasn't just saying, I want to hear about your family, I want to hear about your whole life. He was saying, I want to hear about what took place during this crime. The government heard that very clearly because the government said, sure, why doesn't she stand up and say, you know, I got in over my head, I didn't realize what was going on, and by the time I realized what was happening, it was too late. The government offered a script for her to satisfy Judge Wright. She didn't want to use that script because she thought it was going to hurt her chances on the appeal. And Judge Wright said, fine, if you don't want to tell me. That's what I want to know. And if you don't want to tell me, I'm supposed to have the 130-month sentence that probation recommended and the 120-month sentence that the government recommended. Okay, so I still want to reserve some time. Are there any other questions that I need to address right now? Apparently not. Good morning, Your Honors. Ali Mogadish on behalf of the United States. May it please the Court. Your Honors, I would like to start where counsel left off with respect to Ms. Wynn's ultimate sentence in this case. As Judge Wynn just alluded to, the Court did announce its tentative at the start of the hearing. Despite what Mr. Brown claims was mistaken belief based on the old PSR, he actually talked about the revised PSR first. He clearly articulated the guidelines calculation and the range on the record, and thereafter, he announced his tentative would be 180 months. And thereafter, for the rest of the luminous hearing that occurred, actually needed to be split into two parts. I was trial counsel and I was there. We talked about the defendant. And Mr. Corey, trial counsel, got up and he tried to paint the defendant as an innocent bystander. He literally said she was an innocent bystander. He said at most her culpability in the case was for $800,000, not the $11 million that was billed and received during her tenure as the pharmacist in charge. After all of that, Mr. Corey, counsel, said, quote, a defect in this whole process is that there's no judge in this building or in another federal courthouse that really knows the defendant. Essentially intimating that the Court may hear from the defendant. Thereafter, the Court made comments such as that he was eager and looking forward to hearing similar to what Judge Lombardi was saying about knowing who this person is, because certainly that is something important to a judicial court judge in sentencing. Much to everyone's surprise, counsel said that she was going to be invoking or, excuse me, exercising her right to not allocute, which was completely fine, and the Court didn't penalize her for it. Instead, having sat through that entire hearing, having not heard any mitigation, he decided to stick with his tentative, which was 180 months. The government doesn't believe there was anything wrong with that. It was a substantively reasonable sentence in light of the facts that the Court sat through during that week-long trial. I think that you can infer from the transcript that he thought an upward variance was warranted. Well, certainly. And I don't think I want to belabor that point, at least for me, but I have some other questions, if I can. Absolutely. Let's talk about defendant's argument that count 49 was constructively amended. So as I looked at that issue, and I'm looking at testimony and evidence about what I'll call the Grewal audit, I hope I'm pronouncing. Grewal, Your Honor. Grewal, thank you. And then the IWP audit. So there's a little bit of commingling there of these different audits, and the defendant was only charged with the Grewal audit. Okay. So what I would like to know is, can you tell me what instructions were in place for the jury members such that they wouldn't get confused? Well, Your Honor, I think that the strongest instruction was the trial indictment that went back with the jury. They were given a sanitized version of the trial indictment that specifically articulated the date of the Grewal audit, the conduct at issue in the Grewal audit, which was unique. It was separate from the IWP audit that you alluded to earlier. The IWP audit involved the defendant actually being at the pharmacy, walking the auditor through the prescriptions and their records. Conversely, the charge, count 49 charged audit, Dr. Grewal's audit, involved her falsification and providing Dr. Grewal with falsified prescriptions. And the jury heard ample evidence of that. In fact, a part of the cross-examination of the defendant focused on the Grewal audit. In fact, we didn't even get to the IWP audit. It was all about Dr. Grewal. But the jury instructions referred to just the general obstruction of federal audit. They didn't specify whether it was the Grewal or the IWP audits, correct? Absolutely. But again, the trial indictment did specify. And they had that trial indictment with them. And this wasn't a jury that just simply signed off. They actually had questions. They presented a jury note and the party said to come back and instruct the jury on that note. Notably, they had no questions about count 49. There was no question in their minds because it was explicitly stated in the trial indictment that they had with them. And they certainly had no trouble finding her guilty of that count. The closing argument did reference the March 17th audit sort of interchangeably with the Grewal audit. And so the question is whether under Ward the jury could have found her guilty based on uncharged conduct. I don't believe so, Your Honor, because unlike Ward where there was generally confusion about who the victim was, here, again, that trial indictment specifically mentioned which audit we're talking about. And again, there were distinct characteristics between the Grewal audit and the IWP audit. So I do not believe it was inappropriate or that the jury wasn't instructed sufficiently to be able to tell the distinction. And with respect to the closing argument, we were quite clear in that the Dr. Grewal audit involved the timeline of how it involved the defendant and, frankly, her sister and others at the pharmacy falsifying prescriptions that were then provided to Dr. Grewal via e-mail. And the jury had all of that. They had the timeline. They had the underlying documents of the Grewal audit. So opposing counsel points to the language. And, of course, on March 17th, the day they dreaded occurred, Daniel Craig Winter, referring to the March 17th audit as being more evidence of her guilt. Well, certainly, first of all, the IWP audit, it was admissible. It was direct evidence of her involvement in the scheme. Certainly, the jury was entitled to use that evidence that went to her intent, to her knowledge. It could not only be used as to the scheme that was charged, which is quite broad, but certainly it could also be used to her role in the Grewal audit. It was admissible evidence on both of those grounds. And with respect to the dreaded day, and I was the one making the closing argument, that was with respect to the IWP audit. That was with respect to the fact that that audit, that the jury saw text messages between the defendant and her co-conspirator, Mr. Ezzador, who was the nominal owner of the pharmacy, that this was now being essentially looked at by auditors, that they were now honing in on the potential fraud at the firm, and that was something that she communicated frequently with her co-conspirator, Mr. Ezzador. So I understand counsel's argument with respect to confusion. I don't believe that's what occurred, not only because the jury certainly had questions, and that notably wasn't one of them, but also because that trial indictment, very different from Ward, it explicitly said what this audit was, and given distinct characteristics of the Grewal audit, there was no jury confusion with respect to Count 49. Can you also address the argument opposing counsel makes about the adjustment for use of a special skill? As I read the government's brief, they seem to pivot to, well, it's a trust, the special position of trust issue, which isn't really what was before the district court, what the district court seemed to rely on. Well, Your Honor, yes, there is the pivot to abuse of trust. But there also, it wasn't a full pivot. There was also evidence that the government presented at trial we call the magic language, where the defendant was asked to provide Dr. Grewal with essentially coded language that he could use to get those prescriptions approved. So the argument that, if I understand the argument of opposing counsel correctly, the argument is that that email with the coded language was to trigger insurance coverage, not to interfere with the audit. And so the argument is there really was no coded language in the prescriptions, the patient prescriptions that were provided to Dr. Grewal. Well, just because Dr. Grewal didn't ultimately use that language doesn't exculpate the defendant. She still affirmatively provided that language, which was very unorthodox. But was it for an audit or was it for triggering insurance coverage? The opposing counsel argues that was just for insurance coverage. I don't know that we presented that evidence for one or the other. It was really just the unorthodox nature of a pharmacist providing that magic language to a prescriber, which really doesn't happen and shouldn't happen. And it was indicative of her knowledge of the scheme, of her intent in the scheme, and her complicitness, frankly, in what was happening, and her eagerness in furthering the scheme. So I do believe that was an independent grounds for the skill, but certainly the abuse of trust. Again, the Court certainly appreciated that she was a licensed pharmacist in the State of California, and that was incumbent on her. There was a higher sense of culpability as opposed to her co-defendants, who didn't have that same level of trust with the State of California. Mr. Magadis, there's also this issue of Rule 32 that overlays this. So even if that's correct, don't we have to send this back to the district court to rule on the PSR objection? I don't believe so. I do think, again, that was a very voluminous hearing. It was two parts. We had to break for lunch, in fact. The court adequately addressed counsel's arguments. One of the biggest issues that they had was for loss, where Mr. Corey, trial counsel, was representing that loss was only $800,000. Certainly, the court sat and listened to all of those arguments, only then to rebut and to disregard that argument, given the— I didn't see anywhere where Judge Wright said, I'm overruling the defendant's objection. Nothing really even close to that. The closest it came was at one point he said, I'd like to move on to sentencing now. And then your colleague, I think it was your colleague at the United States Attorney's Office, said, okay, let's do that of some nature. But defendants didn't say anything. Well, certainly the district court adopted the PSR and the revised PSR. And I think that amounts to certainly a consideration of all the objections. But to the extent that he didn't explicitly overrule it, it's clear that in adopting the PSR, in articulating the enhancements that he was going to be using in this case, that was abundantly clear to the parties. I don't think adopting the PSR and saying that I'm going to rely on that analysis is really sufficient where there are factual disputes. I mean, any sentence is a big deal, but a 180-month sentence is a very big deal. And when there are factual disputes on the record, I think it's incumbent on the court to resolve those factual disputes. And as I read the record, and correct me if I'm wrong, it's unclear whether the special skills assessment was based on the communications to Gruvall or whether it's the Armstrong. And part of the government's alternative argument here is that, well, the Armstrong information is in the record. That's sufficient. Shouldn't we be able to tell from the record what the basis of the court's factual findings is in order to make that enhancement? And the same with the loss. I couldn't tell what the district court was really relying on in terms of ruling on the factual objections on loss. And again, Your Honor, perhaps he could have used clearer language, but being in the courtroom and having that debate versus, are we talking about an $800,000 case or an $11 million case, it was clear that the court was rejecting counsel's arguments that it was only $800,000. And again, this court is entitled, and frankly, the district court is entitled to use its presence and having sat through that week-long trial, having sat through the voluminous evidence that the government presented, including through agent testimony. In fact, the agent is here today who testified as to the $11 million that was billed during that four-month time period that the defendant was the pharmacist in charge. The court heard that evidence. All that was required was to prove it by a presumption, and that was clearly had that happened at trial, and the court was entitled to rely on that at sentencing. Can I ask again about the loss issue? So opposing counsel relies on paragraph 19 of the PSR, which is in the background section, but it says that there was news reports of rampant fraud by pharmacies like IWP that were paying kickbacks for medically unnecessary prescriptions. And Ms. Winn raised the argument that the prescriptions issued by Winn were not all medically unnecessary. There was no evidence to that effect, and argued that the district court didn't rule on that particular argument. Can you address that argument? And I apologize, Your Honor. So the argument was that there were news reports? That Ms. Winn argued that the government failed to prove that all of the prescriptions she prepared were medically unnecessary, and she argues that the PSR suggested that they may have been or that some pharmacies were issuing medically unnecessary prescriptions. Well, I'm not sure, frankly, that that would be an appropriate objection. That didn't go to any of the enhancements. That was, frankly, a trial issue, which the government did prove beyond a reasonable doubt that those prescriptions at issue were fraudulent. I don't believe it's necessary for the government to prove that they were medically unnecessary. Certainly, they can be medically necessary, but still fraudulent. And the government presented ample testimony that the whole process, the way that these prescriptions were referred to the pharmacy was through marketers who were paid illegal kickbacks, that the defendant was aware of that. And so I'm not sure that it was incumbent on the district court to rule on that objection to the extent that it was made. That seems like a jury question that they certainly breached in finding her guilty on all counts. Can you pivot to the Speedy Trial Act issue? I'm happy to. So a little bit of background. Certainly, this case was charged December of 2019, so just shy of our March COVID-19 outbreak. Thereafter, there were three trial continuances, each of which the defendant signed on to. It was that fourth continuance, and I believe it was September of 2021, that the government filed an ex parte application, very different from the routine stipulations that we typically file when all parties are signed on. So we filed an ex parte application, and it did have two of the defendant's signatures on there, because certainly they were the ones requesting the time, given the pandemic, given their need to continue to prepare for trial. On the government's ex parte application, which I happen to have a copy of. When was that filed? This was filed on September 21st of 2021. This is at docket 165, but I know there's an ER site somewhere for it. It says in the caption, it says, to continue the trial over the objection of Defendant Nguyen. On the first page, it says, over the objection of Defendant Sandy Nguyen. And it notes in the actual application that despite conferring with counsel, Defendant Nguyen did not provide a legal basis for her objection. And certainly the government filed the ex parte application, and it was ruled on quite quickly by the district court. But as Judge Laborde noted, there are mechanisms for counsel to push back on that. If not filing the opposition, certainly a motion for reconsideration could have been filed. Instead, what happened was an entire year passed, an entire year passed before counsel filed a motion to dismiss for speedy trial violations. But importantly, and I apologize that this didn't make its way into the government's papers. Importantly, in May of 2022, and I have the docket site, in May of 2022, Defendant Nguyen filed or at least requested a continuance because counsel had a conflict in September of 2022. And so counsel noted that over a year would be presumptively unreasonable. But there are considerations in Henry that this court has articulated for whether or not that delay was truly unreasonable. One consideration is, was the defendant in custody or on bond? Certainly she was on bond in this case. Another consideration, did she file a motion for severance? She didn't in this case. And finally, has the defendant consistently been invoking her speedy trial rights? And here she did not. Not only did she sit silent when the court granted the government's ex parte application, but a year went by before she filed a motion to dismiss. And before that, notably, she filed a motion, or excuse me, didn't file a motion, but requested a continuance. And I'm going to direct the court to the docket entry. Yeah, I was going to ask you, is that May 2022 continuance in the record? Well, it's a CR site. So it's CR 185. On the criminal docket, CR 185. And that's an ex parte motion that was filed? Or what type of document was that? So what happened was the government actually filed another ex parte application after conferring with defense counsel on the schedule for pretrial motions and expert disclosures. Counsel notified us that the client was going to be requesting a continuance. And to get ahead of it, the government filed an ex parte application and noted this issue, and defense filed an opposition to that. And so what the court will see is in the opposition, which again is at docket 185 and on page 4, counsel writes, indeed, proceeding with trial on November 15, 2022, given Nguyen's counsel's conflicting schedule, which is largely the result of court closures in response to the pandemic, will effectively rob Nguyen of her right to be represented by counsel of her choice. So notably, it is actually the defendant who's requesting a continuance before that November 2022 trial date. And one of the basis is the result of court closures in response to the pandemic, which leads me to another point that, although not explicitly articulated in the application and the proposed order, although we do know that COVID-19 had presented an issue in counsel conferring with their clients, at the motion to dismiss hearing, the court clearly talked about the effects of the global pandemic and that it was unreasonable to believe that we could proceed to trial in 2021. And in counsel's papers, they talk about normalcy at that time, but it was far from normal at that time. In fact, I did one of the first trials in our district in June of 2021, and that wasn't normal. There was a priority for in-custody defendants. And even at that time, there could only be three trials at any given moment, and they had to be on all different floors. And so in this case, to go to trial in September or November of 2021, when all the defendants were on bond, was not feasible. The court noted as much, although not in 2021, but it certainly commented on that in 2022. And the court is entitled to take that independent reasoning into account as well. With respect to everybody's on board, which counsel noted, again, in context, and Judge Labordi noted, this was a year later. This was a hearing a year later. It's unclear, unfortunately. No one pressed the court for what do you mean specifically about everybody's on board, but it's notable. This was a pretrial conference where there were multiple... I'd like to venture a guess that it was certainly over six, maybe as much as eight or nine motions that were on calendar that day. And the court was certainly prepared. I know counsel was speculating that the court hadn't read the papers. That's far from the truth. The court was prepared to rule on all of these motions and, in fact, did rule. So the idea that he did not appreciate that the ex-party application the government filed that noted Ms. Wynn's objection, that he didn't review the motion to dismiss when, again, they parrot the arguments about that she didn't sign on to that continuance, that's just not practical. It's not plausible that the court was operating under the assumption that Ms. Wynn was on board for that continuance as well. That's just, it's not plausible. The court clearly appreciated that. There was an independent reason to grant the speedy trial request, and that delay of 378, that was reasonable in light of all of the factors articulated. Thank you. Thank you for your argument. We have a few minutes left for rebuttal. Thank you, Your Honor. Let me start with the speedy trial stuff that the government counsel was just mentioning. The first issue I want to raise is, counsel said that it's a requirement that the defendant must consistently be asserting her Speedy Trial Act rights. That's not true. If the court looks at the Lloyd case, Lloyd was granted, or this court affirmed, or reversed, I guess, and Lloyd did not consistently assert his rights in that case. Another defendant did, but the court treated them the same way. Ms. Wynn asserted her rights the way that you're supposed to do it, by filing a motion to dismiss. The government counsel said that she needed to file for a severance motion. The Messer case that's cited in our briefs at 197 Fed Third 340 says that a severance request is implicit in an objection to a Speedy Trial Act continuance request. Government counsel also noted that it put in in its ex parte application the fact that defendant did not provide a legal basis for objecting. That's the government's opinion. It would have been nice for Judge Wright to give us an opportunity to address that. The fact that the government put that in the record I don't think carries very much weight. I'm not familiar with CR 185 right now at this moment. I think if the court is inclined to rule against my client on the Speedy Trial Act issue, on any basis related to the May request, I'd like an opportunity to address that in writing. I haven't had a chance to go back and look at the record while the argument was being made. I'd also just like to go back to the issue having to do with the constructive amendment and note government counsel's main argument was that the indictment went back to the jury. And I just want to note for the court that the indictment went back to the jury and ward and that didn't make any difference in the ward case. This court still ruled that there was a constructive amendment of the indictment there despite the fact that the jury was holding on to a copy of the indictment. But isn't the jury questions that came during deliberations, isn't that indicative that they were using the indictment as a guide, that they were able to sort the evidence? I don't think so, Your Honor. The questions that came out actually had to do with the lack of evidence on counts 15 through 21. The government failed to introduce any prescriptions or offer any testimony from the doctor who had prescribed or supposedly prescribed those prescriptions. And so what the jury notes had to do with was where's the evidence on these counts? That's primarily what happened. The fact that a note doesn't come out can't mean on every occasion that the jury didn't have any questions. I think probably what it means is that the jury thought that it could convict on count 49 based upon the evidence that the government put forward about the Irvine Wellness Audit as opposed to the Gray Wall Audit. And I do want to just point out that, as the court had noted earlier, the government very specifically conflated the two of them during the closing arguments. I see I've run out of time, and there were many other issues that the court raised that I didn't get a chance to address. Are there any other questions? Apparently not. I think we have your argument. Let me thank both sides for their arguments in this complicated case. The case of United States v. Sandy Wynn is submitted and we're adjourned for this session. All rise. This court for this session stands adjourned.
judges: IKUTA, NGUYEN, Liburdi